**SHAW LEWENZ**
Zachary D. Ludens, SBN 360153
95 Third Street, Second Floor
San Francisco, CA 94103
Tel.: 954.595.6075
Fax: 954.989.7781
Email: zludens@shawlewenz.com
*(additional counsel listed on signature page)*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

### CASE NO. 26-cv-02067

| | |
|---|---|
| **ROBBY ALAN STEELE,** individually, and on behalf of all similarly situated, | **CLASS ACTION COMPLAINT FOR DAMAGES** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| **JPMORGAN CHASE BANK, N.A.,** | |
| Defendant. | |

Plaintiff Robby Alan Steele ("Plaintiff" or "Steele"), by and through undersigned counsel of record, hereby brings this action against Defendant, JPMorgan Chase Bank, N.A. ("Chase"), and, for his Complaint, states as follows:

### INTRODUCTION

1. This is a class action against Chase Bank for enabling a massive cryptocurrency fraudulent scheme orchestrated by Goliath Ventures, Inc. ("Goliath")— a scheme that caused Plaintiff Steele to liquidate his retirement account only to see it vanish after he wired it to Goliath's bank account with Chase.

2. The Ponzi scheme continued until the United States arrested the CEO of Goliath, Christopher Delgado ("Delgado"), on February 24, 2026. Upon information and belief, the federal government is presently pursuing a forfeiture claim against Delgado and seizing all of his personal assets.

3. This action arises from Chase's role in enabling, aiding, and abetting the cryptocurrency investment Ponzi scheme operated through its bank customer, Goliath.

According to the United States, Goliath obtained at least $328 million from what are believed to be over 2,000 investors.

4.    Chase, believed to be the sole banking institution for Goliath for a time—from January 2023 to May or June 2025—is led by Wall Street celebrity CEO Jamie Dimon.  Ironically, Dimon had been one of the most prominent Wall Street critics of cryptocurrency.

a.  Between 2014 and 2016, Dimon expressed general skepticism about Bitcoin and other cryptocurrencies, emphasizing that banks were interested in blockchain technology, but not necessarily Bitcoin itself.

b.  In 2017, Dimon publicly remarked that "Bitcoin is a fraud."  At a Barclays conference that same year, Dimon repeated that Bitcoin is "a fraud" and predicted its eventually collapse.  Dimon also said he would fire any JPMorgan trader caught trading it.  Dimon compared Bitcoin speculation to the tulip bubble.  Dimon's remarks reportedly moved markets, and Bitcoin prices briefly dropped after the remarks.

c.  In 2018, Dimon said he regretted calling Bitcoin a fraud but still doubted its legitimacy.  Dimon reiterated concerns about criminal uses and speculation.

d.  Between 2020 and 2021, Dimon renewed his criticism, again attacking cryptocurrency markets at several conferences.  For example, in October 2021, Dimon called Bitcoin "worthless" and predicted governments would heavily regulate crypto.  Further, Dimon warned that crypto could facilitate crime or illicit finance.

e.  In 2023, during a U.S. Senate hearing, Dimon again sharply criticized crypto.  Dimon said cryptocurrencies were heavily used for money laundering, fraud, and ransomware and suggested the government should consider shutting them down.

f. In January 2024, Dimon spoke at the World Economic Forum in Davos, where he called Bitcoin a "pet rock" and reiterated that Dimon would never personally buy it. Dimon added that he supports people's right to buy Bitcoin, however, comparing it to smoking cigarettes.

5. Between 2022 and 2025, something at Chase changed. And it is, in part, that change that allowed Goliath's Ponzi scheme to grow to the size that it did. Specifically, Chase negotiated and finalized a "partnership" with one of the world's largest crypto currency exchanges—Coinbase—the same exchange that worked alongside Chase and Goliath (the "Chase-Coinbase Partnership").

6. The Chase-Coinbase Partnership "g[a]ve users more ways than ever to get into crypto" and even allowed customers to fund their cryptocurrency wallets with Chase credit cards. Chase was not going to do anything to jeopardize this unusual, undoubtedly dangerous, but profitable partnership.

7. Now, not only was Chase open to the public purchase of cryptocurrency "pet rocks," it was actively encouraging, enabling, and profiting from those purchases—so much so that it turned a blind eye to, and in fact aided and abetted, a $328 million dollar cryptocurrency Ponzi scheme.

8. Despite Dimon's long history of criticizing cryptocurrency, including publicly acknowledging that cryptocurrency is being used for money laundering, fraud, ransomware, and even recommending the government should shut crypto down, Chase knowingly permitted a bank customer—Goliath—to commingle investors' money at Chase for cryptocurrency investments, and to use those funds from later investors to pay earlier investors' money, in a classic Ponzi scheme fashion, all while Delgado bought millions and millions of dollars in cars, jewelry, and real estate.

9. While mounting up insurmountable debt through fraud, Goliath used accounts at Chase to misappropriate funds by making improper transfers, making transfers to CEO Delgado, and paying false returns to investors.

10.     Delgado was the president and CEO of Goliath and had complete dominion and control over Goliath and its finances.  For a time, accounts at Chase served as the exclusive vehicle to misappropriate Goliath funds from investors and recharacterize investment funds into purported profit payments to investors.  Indeed, for a time it is believed that Chase hosted all the accounts of Goliath and executed the deceptive transactions that allowed Delgado to run the fraudulent scheme and dissipate Goliath's accounts.  Upon information and belief, Delgado also held a personal bank account at Chase, which received large transfers from one or more Goliath accounts.  Funds sent to Goliath from investors were primarily deposited into the Chase account known as JPMC 0305 account.

11.     For example: From January 2023 through June 2025, approximately $253 million was deposited into the JPMC 0305 account.  That is nearly 2/3 of the $328 million collected from investors noted by the United States in charging Delgado.  From January 2023 through June 2025, approximately $123 million from the JPMC 0305 account was transferred to Goliath's wallets maintained by Chase's strategic partner, Coinbase.

12.     To briefly recap, Chase knew and publicly announced the frequent fraud and financial schemes associated with cryptocurrency.  Nevertheless, Chase approved a cryptocurrency fund, with no formal filings, regulatory compliance, or other safeguards, to transact a quarter of a billion dollars between the United States, Qatar, and other countries, and to send over $120 million to its partner, a cryptocurrency exchange, without meaningful restriction—at least not until it was too late.  Chase knew the risks associated with this enterprise, yet proceeded anyway, enabling a massive fraud under the imprimatur of one of the world's largest and most trusted financial institutions.  Chase continued after developing *actual knowledge* of Goliath's Ponzi scheme.

13.     And, from January 2023 through June 2025, approximately $50 million from the JPMC 0305 account was sent to investors purportedly as returns on

investments.  Although Goliath falsely represented that these payments were returns on investments, the outgoing transfers were primarily funded with money held in the JPMC 0305 account that investors sent to Goliath for investing purposes.  The outgoing transfers were not returns from any investment activity.  Chase saw this.

14.    Goliath's Coinbase account was linked to the Chase account JPMC 0305 account and capable of conducting both ACH.[1]  From October 2022 to February 2025, all deposits of fiat currency into Goliath wallets were Fed wire deposits.

15.    Analysis of bank records showed that Goliath electronically transferred funds to Coinbase from the JPMC 0305 account.  By way of example, on or about February 1, 2024, Delgado knowingly engaged in a monetary transaction by, though, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, the transfer of $300,000 of U.S. currency, such property having been derived from a specified unlawful activity: wire fraud.  This transfer included $40,000 an investor had given to Goliath on February 1, 2024, with the understanding that it would be used in a liquidity pool, as will be described in more detail below.  The transfer also included the money of other investors given with a similar understanding.

16.    Chase had actual knowledge of and substantially assisted Goliath's cryptocurrency Ponzi scheme.  From a bank's perspective, the fraudulent scheme was obvious.  A fraudulent scheme of this magnitude cannot be run surreptitiously through one bank.  And here, it did not.

17.    Goliath marketed "joint venture agreements" to investors nationwide as an opportunity to generate profits through cryptocurrency trading strategies and

---

[1] Automated Clearing House, a nationwide electronic fund transfer system operated through the Federal Reserve and national clearing centers. It connects most U.S. banks and credit and Fedwire transactions

digital-asset arbitrage. Investors were told that their funds would be pooled and used to generate consistent trading profits in cryptocurrency markets.

18.    In reality, as alleged in a federal criminal case against Delgado (*United States v. Christopher Alexander Delgado* (U.S.D.C. M.D. Fla. Case No. 6:26-mj-01240-LHP), Goliath operated a Ponzi scheme in which new investor funds were used to pay earlier investors.

19.    One of those victims is Plaintiff Robby Steele. Steele invested $310,000 of his own cash into Goliath and, even more devastatingly, withdrew money from his 401(k) retirement account, paid the taxes, and then invested $340,000 of his retirement savings into Goliath.

20.    The joint venture agreements sold by Goliath were not traded on any national securities exchange and were privately marketed investment contracts.

21.    Chase provided the essential banking infrastructure through which the Ponzi scheme operated.

22.    Chase processed investor deposits, facilitated transfers among related entities, and enabled the redistribution of investor funds in a manner that created the false appearance of legitimate profits.

23.    Numerous red flags made the fraudulent nature of the scheme obvious and known to Chase. Despite those red flags, Chase turned a blind eye and continued servicing the accounts used to perpetrate the fraud, earning substantial fees from the hundreds of millions of dollars it washed through Goliath and Delgado's banking activities at Chase.

24.    And, crucially, Chase had more than *just* these red flags. Chase had *actual knowledge* of Goliath's cryptocurrency Ponzi scheme—as is the only logical inference from all of the red flags that Chase ignored. Yet, Chase continued to aid and abet Goliath, anyway.

## PARTIES

25.    Plaintiff Robby A. Steele is a resident of California.  Plaintiff Steele invested hundreds of thousands of dollars in Goliath investment agreements, wiring the funds to accounts held at Chase.

26.    Defendant JPMorgan Chase Bank, N.A. is a national banking association chartered by the Office of the Comptroller of the Currency with its main office located in Columbus, Ohio, and with branches throughout the United States and substantial, and not isolated, operations in California.

## JURISDICTION AND VENUE

27.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §1332. Plaintiff is a citizen of California and Defendant is a citizen of Ohio and the amount in controversy exceeds $75,000 exclusive of attorneys' fees, interest, and costs.  Chase is a national banking association whose main office, as designated in its articles of association, is located in Columbus, Ohio, which makes Chase deemed to be an Ohio citizen for purposes of diversity of citizenship.

28.    This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), as this action is brought as a class action on behalf of class members exceeding 100, one or more members of the class are citizens of a state different than the Defendants, and the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

29.    This Court has personal jurisdiction over Chase under California Code of Civil Procedure Section 410.10, which makes the Court's personal jurisdiction coextensive with that permitted by the due process clause.  Given Chase's substantial and not isolated activity in California, which makes Chase "essentially at home" in California.  Further, Chase accepted the wire transfer from Plaintiff—a California citizen—making Chase subject to specific personal jurisdiction.

30.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Chase maintains substantial, continuous, and systematic operations within the Northern District of California and a substantial part of the events and omissions giving rise to the claims occurred within this District.  Among other locations, Chase maintains a major regional office at 560 Mission Street in San Francisco, California, where it leases approximately 280,000 square feet of office space and employs more than 1,600 personnel.    Through its San Francisco operations, Chase conducts substantial commercial banking, investment banking, private banking, and wealth management activities serving clients throughout the United States and internationally.  Following its 2023 acquisition of the assets of First Republic Bank, which had been headquartered in San Francisco, Chase significantly expanded its private banking and wealth management operations within the Northern District of California.  Chase also maintains numerous additional offices and financial centers throughout the San Francisco Bay Area and employs thousands of personnel within the region.    In addition, Chase maintains significant technology, payments, and financial infrastructure within the Northern District of California that supports its electronic banking, financial transaction processing, and fintech-related services.  Upon information and belief, Chase personnel, systems, and infrastructure located within this District were involved in processing, facilitating, routing, or overseeing electronic fund transfers and related financial transactions between Chase accounts and cryptocurrency platforms and exchanges connected to the Goliath enterprise.  The Northern District of California is also a major hub for the technology, fintech, venture capital, and digital asset industries, and Chase's San Francisco operations regularly provide financial services to clients operating within these sectors.    Accordingly, Chase regularly conducts substantial and continuous business within this District and is subject to personal jurisdiction here, and venue is, therefore, proper in this District.

GENERAL ALLEGATIONS

## I.    BANK SECRECY ACT AND AML OBLIGATIONS

31.    Banks operating in the United States must comply with the Bank Secrecy Act (the "BSA"), 31 U.S.C. Section 5311, *et seq.*

32.    The BSA requires financial institutions to maintain anti-money laundering programs designed to detect suspicious financial activity.

33.    Implementing regulations require banks to maintain internal monitoring systems, customer due diligence procedures, and suspicious activity reporting programs. For example, 31 C.F.R. Section 1020.210 requires banks to implement anti-money laundering compliance programs.  31 C.F.R. Section 1020.220 requires banks to maintain customer identification programs.  Banks must also file Suspicious Activity Reports ("SARs") when transactions suggest possible fraud or money laundering.

34.    Federal banking guidance identifies red flags including, but not limited to: (a) rapid inflows and outflows of funds; (b) commingling of funds; (c) transfers between related accounts; (d) transactions inconsistent with a customer's business model; (e) circular transfers of funds; (f) atypical Wealth Inconsistency; High-value transactions or lifestyles that are not commensurate with the customer's known income, occupation, or business line; and (d) many large, round dollar transactions.

35.    Banks are required to monitor these patterns and investigate suspicious activity.

36.    Federal law requires banks to "know their customers" and understand their customers' banking behavior.  *See, e.g.*, 31 C.F.R. § 1020.220.  According to Chase, Chase complies with these obligations.  Chase must collect information about its customers when it opens an account for the customers and as they transact.  Where an entity opens an account, the bank must obtain information concerning the individuals who control the account.  Chase also must conduct customer due diligence to gauge the

risk of fraud, money laundering, terrorist financing, or other illicit account uses.  *See, e.g.*, 31 CFR § 1020.210.

37.    Chase is required to understand the types of transactions in which its customers are likely to engage and remain vigilant for transactions that may be suspicious.  These laws impose on Chase a duty to understand the nature and purpose of their customer relationships and develop a customer risk profile.  This information must then be used for ongoing monitoring of its customers' transactions.  Such duties form part of the federally mandated compliance with Anti-Money-Laundering ("AML") laws.  *See* 12 C.F.R. § 21.21.

38.    When monitoring its customers' accounts, Chase is obligated to comply with the BSA, including regulations broadening its AML provisions.  The BSA requires Chase to develop, administer, and maintain a program to ensure compliance.  The program must be approved by the bank's board of directors and noted in the board meeting minutes.  The compliance program must (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance and (4) provide training for appropriate personnel.

39.    Chase must also maintain a customer due diligence program to predict the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each customer.  The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

40.    Chase knows its customer due diligence programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid.  Where a customer is determined to be high risk, banks should gather additional information about the customer and accounts, including determining:

(1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

41.    Accordingly, Chase implements its customer identification and due diligence programs in a manner that allows it to (1) know who is in charge of each account, (2) the nature and purpose of the account and the customer's business, and (3) the anticipated transactions that will be processed through the account, together with expected volume and frequency.

42.    In connection with these programs and processes, Chase has a senior bank official responsible for compliance with AML requirements.  Chase also has sector, regional, and legal entity AML compliance officers responsible for coordinating and monitoring day-to-day compliance.

43.    The Federal Financial Institutions Examination Council (the "FFIEC") sets standards and guidelines for banks to comply with their AML obligations.  FFIEC publications describe certain "red flags" that indicate possible money laundering schemes and other misconduct requiring further inquiry.  Chase and its personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering indicia set forth in the Federal Financial Institutions Examination Council's BSA/AML Examination Manual.  These include:

a. "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

b. "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

c. "Unusual use of trust funds in business transactions or other financial activity."

d. "Customer makes high value transactions not commensurate with the customer's known incomes."

e. "A large volume of . . . funds transfers is deposited into . . . an account when the nature of the accountholder's business would not appear to justify such activity."

f. "A retail business has dramatically different patterns of currency deposits from similar businesses in the same general location."

g. "Goods or services purchased by the business do not match the customer's stated line of business."

h. "Goods or services, if identified, do not match profile of company provided by respondent bank or character of the financial activity."

i. "Payments or receipts with no apparent links to legitimate contracts, goods, or services are received."

j. "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

k. "Funds transfers contain limited content and lack related party information."

l. "Funds transfers are sent or received from the same person to or from different accounts."

m. "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

n. "Multiple high-value payments or transfers between shell companies with no apparent legitimate business purpose."

o. "Purpose of shell company is unknown or unclear."

p. "Customer has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank."

q. "A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations."

r. "Customer repeatedly uses a bank or branch location that is geographically distant from the customer's home or office without sufficient business purpose."

s. "Deposits are structured through multiple branches of the same bank or by groups of people who enter a single branch at the same time."

t. "Funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations."

u. "Funds are sent or received via international transfers from or to higher-risk locations."

44.    To comply with FFIEC guidance and AML regulations, Chase maintains systems to monitor accounts and account activity for improper activity.  This includes review, monitoring, and evaluation of transactions, the transacting parties, the parties' identity, and account patterns.  Chase is further expected to consult external sources, such as the internet, commercial databases, and direct inquiries to evaluate the nature of suspicious transactions and the identities of the parties to the transactions.

45.    Chase collects and maintains information about its customers and their banking behavior to, among other things, detect and prevent money laundering and fraud and to protect itself.

46.    For this purpose, Chase maintains procedures to determine the identity of each customer—31 C.F.R. §§ 1020.220(a)(1), (2)—and to collect information about the holder of each account—31 C.F.R. § 1020.220(a)(2).  When an entity rather than an individual opens an account, the bank obtains information about the individual who will control the account.  31 C.F.R. § 1020.220(a)(2)(ii)(C).  The information that Chase collects about new business account clients includes the purpose and nature of the business, anticipated activity in the account (*e.g.*, volume, value (number and dollar), and type of transaction), where the customer expects to transact business, and the products and services commonly used by the customer.

47.    Based on this information, as well as external resources like internet search engines and public and commercial record databases, Chase creates an initial client profile and assigns a compliance-related risk rating.  Neither the profile, nor the risk

rating, is final or static.  When Chase learns that customer information has materially changed, its internal controls require updating that information and, where appropriate, reassessing the customer's risk profile or rating.  One of the ways in which the bank becomes aware of such changes is when the customer's transactions appear inconsistent with the bank's understanding of the nature and purpose of the account—for instance, when there are significant, unexplained changes in account activity.

48.    Chase also maintains internal controls to ensure ongoing compliance with federal AML laws and regulations.  These include independent testing of the bank's compliance, regular monitoring of compliance, and training of personnel.  These controls also include customer due diligence programs to prevent and detect money laundering.

49.    Through these programs, Chase obtains information that gives it an understanding of the unique financial activity of its customers.  Likewise, Chase can predict the type and frequency of transactions in which its customers are likely to engage, including the dollar volume and transaction volume typical of each account. These datapoints are then used to identify unusual and suspicious transactions.

50.    Chase provides AML training to all personnel whose duties may require such knowledge, including tellers and wire room personnel, to allow them to detect money laundering and fraud.  Supervising personnel then oversee the day-to-day issues and implementation of the Chase's compliance structure at its individual branches.

51.    Many branch-level employees also regularly review Balance Fluctuation Reports.  These reports highlight substantial balance fluctuations and list the account activity in certain accounts.

52.    Bank employees must also complete Currency Transaction Reports on any cash transactions exceeding $10,000.

53.    To complement these human efforts, Chase uses its advanced transaction monitoring software portfolio, which includes Actimize, an artificial intelligence and

data analytics software platform.  Actimize markets its product as "entity-centric," and capable of revealing hidden connections and relationships between transacting parties across multiple accounts and transactions.

54.    Actimize automatically reviews transactions against customers' backgrounds and transaction histories, compares account activity against AML and other compliance red flags, and automatically detects and analyzes abnormal or risky behavior.  When the software identifies activity warranting further review or escalation, it alerts Chase personnel.

55.    Here, Chase conducted due diligence and engaged in a Know Your Customer analysis of Goliath and Delgado and monitored Goliath's accounts for anomalous or suspicious behavior.  Chase collected and reviewed information about Goliath's business operations, the source of their funds, and the purpose of their accounts.  In doing so, it formed expectations about the proper use of the Goliath's accounts.

56.    Further, Chase knows what its employees know.  In other words, the knowledge of its employees is imputed to Chase.

57.    Chase knew that Delgado was president, CEO, and manager of Goliath and owed fiduciary duties to Goliath and Goliath's partners.

58.    Chase also understood the claimed business model:  To raise money from investors and use it to invest and make profits in cryptocurrency and return those deposits to investors.  Yet, Chase never saw profitable transactions in crypto anywhere sufficient to pay all the investors, if there were ever any profits.

59.    Chase, therefore, should have seen banking activity consistent with this business model.  That is, the banking activity should have reflected its receipt of investor funds for crypto investments, and then the bank should have seen profits from crypto trading come back into the account to pay investors.

60.    But that was not what Chase saw.  Instead, Chase saw a great deal of investor money deposits, inadequate deposits into crypto currency exchanges for investment, woefully insufficient crypto currency exchange deposits coming back necessary to pay investor profits, and an array of banking activities blatantly at odds with the claimed business model.

61.    Chase no doubt saw rapid movement of funds in and out of accounts. Goliath diverted the money to pay lavish payments to its founder, Delgado, to promoters for commissions every month, and to investors, as well as debts of Goliath.  In other words, Chase knew it did not see profits from cryptocurrency transactions anywhere near what was needed to make all those fraudulent transfers to insiders and profit payments to investors.  Nonetheless, Chase ignored these blaring red flags for its own pecuniary gain.

62.    At times, funds deposited and intended for investment in Goliath cryptocurrency were instead diverted to Delgado's personal account.

63.    The volume of funds passing through Goliath's and Delgado's account reflected a material disparity between what Chase expected from the operation of the businesses and Delgado's and Goliath's use of the account.

64.    And, of course, there is the over $120 million transferred to Chase's partner, Coinbase, unfettered and unchecked.

65.    The account activity was rife with wire fraud and money laundering, no doubt generating many alerts to bank employees, and eventually, SARs that Chase was required to file with the federal government.

66.    Chase Bank observed and actively participated in banking behavior that contradicted the stated operation and actively assisted the misappropriation and siphoning of funds by Goliath and Delgado.  Chase knew that such actions with Goliath's funds were improper and harming Goliath and its investors.

67.     Goliath and Delgado's improper use of the accounts was apparent.  Yet, Chase facilitated this use for years and through countless transactions involving hundreds of millions of dollars.

68.     All of this goes to show that Chase had *actual knowledge* of Goliath's Ponzi scheme and substantially assisted Goliath by refusing to close the account and lending the reputation of Chase to Goliath such that unsuspecting investors let their guard down when they believed that Chase would have stopped a Ponzi scheme from taking place.

## II.     THE GOLIATH VENTURES PONZI SCHEME

69.     Goliath promoted cryptocurrency investments promising consistent profits.

70.     Investors were told that their funds would be used in digital-asset trading strategies.

71.     In reality, the operation functioned as a Ponzi scheme.

72.     New investor funds were used to pay earlier investors.

73.     The scheme depended on constant inflows of new capital.

74.     When investor inflows slowed and outflows increased, the scheme collapsed.

## III.     TRANSACTION-LEVEL RED FLAGS

75.     Large volumes of investor deposits entered Goliath bank accounts at Chase.

76.     These deposits occurred in rapid succession and were inconsistent with legitimate business operations.

77.     Funds were frequently transferred between related accounts controlled by Delgado, who controlled Goliath.

78.     Investor deposits were commingled in common operating account(s).

79.     Transfers frequently occurred in round-number amounts.

80.     Deposits were quickly followed by outgoing payments—not to the cryptocurrency exchanges but instead to previous investors—believed to be labeled by Goliath as investor profits.

81.    The velocity of transfers was inconsistent with any legitimate cryptocurrency trading strategy.

82.    Accounts displayed circular payment patterns typical of Ponzi schemes.

83.    And, at the risk of over repetition, there was over $120 million transferred to a cryptocurrency exchange to purchase assets that Chase's own CEO described being heavily used for money laundering and fraud, which are, not coincidentally, almost exactly the charges levied by the United States against Delgado.

84.    Chase observed repeated cycles in which new deposits were redistributed within short periods of time.

85.    The pattern that Chase saw was that little money going into the accounts came from profits of cryptocurrency trading.  Instead, Chase saw a great deal of investor money/investments entering the Goliath accounts and an array of banking activities blatantly at odds with the claimed business model.  Chase saw rapid movement of investment funds through accounts, believed to occur sometimes on the same day. Chase saw the diversion of investor money to cover lavish payments to Delgado and payments to earlier investors.  The account activity was rife with wire fraud and money laundering, which under normal circumstances would trigger alerts.   Additionally, despite the lack of profits, Chase saw new investor funds being used to pay false returns to other investors.

86.    Thus, for any Chase employee who saw how Goliath was moving money between investors, Goliath, crypto accounts, and Delgado, the pattern of misuse of Goliath investors' money was readily apparent.

87.    Despite this knowledge, Chase substantially assisted Goliath allowing and actively enabling the continued operation of Chase accounts, commingle investor funds, diversion of monies to Delgado, and made the transfers necessary to perpetrate the scheme.

88.     With its goal to maximize assets held under management, account and transfer-related revenue, and compensation, Chase and its employees actively accommodated Goliath's pattern of misuse and misappropriation and went well beyond providing ordinary banking services.

## IV.    CRYPTO-EXCHANGE FLOW ALLEGATIONS

89.     The Goliath scheme purported to generate profits through cryptocurrency trading.

90.     Indeed, Goliath described itself on its website at various times as a "Private Equity Firm" that touted that "GOLIATH VENTURES INC. & GOLIATH INTERNATIONAL GROUP is an international firm that develops blockchain technology projects, operates and builds crypto liquidity pools and manages Bitcoin mining infrastructure."    Thus, Chase knew, via their "Know Your Customer" obligations, that Goliath claimed to invest money in cryptocurrency for investors, which they publicly called "partners."    Upon information and belief, Chase knew that a cryptocurrency pool operator should have been licensed as a commodities pool operator with the Commodities Futures Trading Commission and a member of the National Futures Association, as well as registered with the Financial Crimes Enforcement Network ("FinCEN"), but neither Goliath nor Delgado were licensed.    As part of their Know Your Customer obligation, Chase could have and should have confirmed this before accepting the account or continuing to bank Goliath.    Chase knew that it had not done so and thus knowingly turned a blind eye.

91.     However, Chase accounts reflected minimal transfers to legitimate cryptocurrency exchanges.    While Goliath claimed to invest funds into "cryptocurrency liquidity pools," investigators allege that of the $328 million collected, only approximately $1 million was actually invested in any crypto-related assets.

92.     Instead, investor funds circulated primarily between internal accounts.

93.    The absence of significant transfers to trading platforms indicated that the stated business model was fictitious.

94.    A legitimate crypto-trading operation would have generated significant exchange-related activity.

95.    Chase's monitoring system, as designed, did reveal the absence of such activity.

## V.    WHY CHASE COULD NOT HAVE MISSED THE FRAUD

96.    The banking activity associated with Goliath displayed numerous indicia of fraud.

97.    Investor funds flowed into Chase accounts in unusually large volumes.

98.    Those funds were rapidly redistributed to other investors.

99.    The pattern of transfers was inconsistent with legitimate business activity.

100.    The absence of meaningful commercial revenue was apparent from account activity.

101.    The scheme relied entirely on investor deposits.

102.    These patterns are widely recognized indicators of Ponzi activity.

103.    Federal banking guidance specifically identifies such patterns as red flags requiring investigation.

104.    Chase nonetheless continued servicing the accounts.

105.    By ignoring these red flags and armed with *actual knowledge*, Chase enabled Goliath's scheme to continue.

## VI.    THE SCHEME COULD NOT HAVE OPERATED WITHOUT JPMORGAN CHASE

106.    The Goliath scheme depended on access to the banking system.

107.    Investor funds had to be deposited into bank accounts.

108.    Those funds had to be transferred between accounts to conceal the scheme.

109.   Payments to earlier investors had to be processed through banking channels.

110.   Without these services, the Ponzi scheme could not function.

111.   Chase provided those services despite obvious red flags and warning signs that told Chase this was a Ponzi scheme.

112.   By doing so, Chase substantially assisted with the fraudulent scheme.

## CLASS ACTION ALLEGATIONS

113.   Plaintiff brings this action individually and on behalf of a class of similarly situated persons pursuant to Rule 23 of the Federal Rules of Civil Procedure.

114.   Plaintiff seeks to represent a nationwide class defined as:

All persons and entities who invested funds pursuant to Joint Venture Agreements with Goliath and suffered losses as a result of the Goliath investment program.

115.   Plaintiff also seeks to represent a California subclass defined as:

All persons and entities who resided in California or maintained their principal place of business in California at the time of investment who invested funds pursuant to Joint Venture Agreements with Goliath and suffered losses as a result of the Goliath investment program.

116.   Excluded from the class definitions are 1) Defendant and any of its current or former officers, directors, employees, agents, or representatives; 2) any judge or magistrate assigned to this action, members of their staff, and any members of their immediate families; and 3) any person or entity whose total withdrawals, redemptions, or payments from the Goliath investment program exceeded the total amount of that person or entity's invested principal (i.e., "net winners").

117.   Plaintiff reserves the right to modify or amend the Class definition as discovery and further investigation may warrant.

**A. Numerosity**.

118.   The members of the proposed Class are so numerous that joinder of all members is impracticable.

119.   Public filings in the criminal case against Christopher Delgado and related investigative materials indicate that Goliath raised hundreds of millions of dollars from thousands of investors across multiple jurisdictions.

120.   The identities of many Class members are presently known only to Defendants and third-party custodians, including financial institutions and self-directed IRA custodians that processed investor funds.

121.   Given the substantial number of investors and the geographic dispersion of those investors, joinder of all Class members would be impracticable.

**B. Typicality**.

122.   Plaintiff's claims arise from the same legal theories and operative facts as those of the Class and are therefore typical of the claims asserted on behalf of the Class. Plaintiffs and each class member invested in Goliath Ventures Joint Venture Agreements and were subject to the wrongful conduct alleged in this complaint.

123.   Plaintiff and Class members suffered losses as a result of the same course of conduct by Defendant. Plaintiff's losses, like those of the Class, arise from Defendant's uniform conduct in facilitating the Goliath Ponzi scheme.

**C. Adequacy of Representation**.

124.   Plaintiff will fairly and adequately represent and protect the interests of the Class.

125.   Plaintiff's interests are aligned with those of the Class in seeking recovery for losses arising from the Goliath investment program.  Plaintiff has no interests antagonistic to those of the Class and is not subject to any unique defenses that would impair Plaintiff's ability to represent the Class fairly and adequately.  Plaintiff understands the obligations of a class representative and is prepared to fulfill those duties, including participating in discovery, appearing for deposition or trial if necessary, and acting in the best interests of the Class.

126.   Proposed Class Counsel are experienced in prosecuting complex litigation, class actions, and financial fraud matters and have the resources necessary to litigate this action vigorously through trial. Proposed Class Counsel have extensive experience investigating and prosecuting investment-related misconduct and have devoted substantial time and resources to investigating the Goliath investment scheme.

127.   Indeed, prior to the arrest and charging of Goliath's principal, Christopher Delgado, Proposed Class Counsel had already filed some of the first civil actions arising from the Goliath scheme on behalf of injured investors.  Proposed Class Counsel were also the only lawyers to successfully seek the appointment of a receiver to protect remaining assets and preserve potential recoveries for investors.

128.   In addition, Proposed Class Counsel have engaged in extensive investigation of the Goliath scheme, including communications with hundreds of victims and analysis of the investment structure used to solicit investor funds.  Based on that investigation, Proposed Class Counsel are organizing claims not only against the primary wrongdoers but also against third parties that enabled the scheme, including Defendant.

129.   Through these efforts, Proposed Class Counsel have developed substantial knowledge concerning the Goliath enterprise, the role played by its professional advisors, and the damages suffered by investors.  Proposed Class Counsel have committed and will continue to commit the resources necessary to prosecute this action and obtain the best possible recovery for the Class.

130.   Accordingly, Plaintiff and Proposed Class Counsel will fairly and adequately represent and protect the interests of the Class.

**D. Commonality and Predominance.**

131.   Common questions of fact and law exist as to all members of the class and predominate over any questions pertaining to individual class members. Among the questions common to the class are:

a. Whether Goliath and/or Delgado committed fraud and/or breached duties to Plaintiffs and members of the class;

b. Whether Chase aided and abetted, joined, and/or participated in Goliath's and Delgado's fraud and/or breach of duties;

c. Whether Chase knowingly disregarded atypical banking activity and other red flags that Goliath and Delgado were committing investor fraud, breaching fiduciary duties, and/or misappropriating investor funds;

d. Whether Chase had actual knowledge that Goliath and Delgado were committing investor fraud, breaching fiduciary duties, and/or misappropriating investor funds;

e. Whether Chase's continued banking support for Goliath and Delgado violations, to the detriment of Plaintiffs and members of the class, constitutes negligence;

f. Whether Chase's conduct alleged herein violates the Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*); and

g. Whether, in view of their investment losses, Plaintiffs and class members are entitled to damages or restitution.

132. These questions are capable of common proof and will generate common answers that drive the resolution of this litigation.

133. Common questions of law and fact predominate over any questions affecting only individual Class members because Chase's liability arises from a uniform course of conduct directed at the Goliath investment enterprise as a whole, carried out through standardized banking policies, procedures, and systems applied uniformly across all Goliath accounts.

134. As set forth above, this action presents numerous common questions concerning Chase's role in enabling, facilitating, and substantially assisting the Goliath Ponzi scheme. Those questions arise from the same body of conduct—Chase's

onboarding of Goliath as a banking customer, its ongoing maintenance of Goliath's accounts, its execution of hundreds of millions of dollars in transactions through those accounts, and its failure to investigate, report, or terminate banking services despite the accumulation of unmistakable red flags over a period of years.

135.   Chase's conduct did not involve individualized banking decisions directed to particular investors.  Rather, Chase serviced a single enterprise—Goliath—through a defined set of accounts, and the fraudulent scheme operated through those accounts in a uniform and repetitive manner throughout the relevant period.  Every investor who transferred funds to Goliath did so through the same banking infrastructure maintained and serviced by Chase, primarily through the JPMC 0305 account.  Each investor's funds were received, commingled, and redistributed through the same accounts, pursuant to the same pattern of conduct, under the same failures of monitoring and compliance.

136.   The central liability issues therefore concern Chase's own institutional conduct: its onboarding and Know Your Customer analysis of Goliath and Delgado; its transaction monitoring policies and the outputs of those systems, including any alerts generated by the Actimize platform or other compliance tools; its compliance with BSA and AML obligations; its decision to continue servicing Goliath despite the accumulation of red flags; and the nature and extent of its actual knowledge of the fraudulent nature of the scheme.  Resolution of those issues will depend upon common evidence, including Chase's internal account records for the Goliath and Delgado accounts, Chase's AML and compliance policies and procedures, records of any Suspicious Activity Reports filed or not filed, records of internal alerts generated by Chase's transaction monitoring systems, communications between Chase personnel concerning the Goliath accounts, and testimony concerning Chase's institutional knowledge and decision-making.

137. Because Chase's alleged misconduct concerns its uniform provision of banking services to a single enterprise operating a single fraudulent scheme, the determination of whether Chase aided and abetted fraud, aided and abetted breach of fiduciary duty, acted negligently, or violated the UCL will turn on evidence common to the Class rather than individualized proof. The same set of transactions, the same monitoring failures, and the same institutional decisions that give rise to Chase's liability with respect to one investor give rise to its liability with respect to all investors.

138. The core questions driving the resolution of this litigation—whether Chase's transaction monitoring systems detected or should have detected the hallmarks of Ponzi activity in the Goliath accounts; whether Chase had actual or constructive knowledge of the fraudulent scheme; whether Chase substantially assisted the scheme by continuing to service those accounts; and whether Chase's conduct violated applicable law—are each susceptible to common, class-wide proof. None of these questions requires examination of any individual investor's relationship with Chase, knowledge of the scheme, or investment decisions.

139. Any individualized issues that may arise relate primarily to the calculation of damages and do not defeat predominance. The losses sustained by individual Class members can be determined through objective financial records reflecting the amounts each investor contributed to and withdrew from the Goliath investment program, without resort to individualized inquiry into Chase's conduct. Because the measure of damages is tied to the uniform fraudulent scheme that Chase enabled—and not to any individualized interaction between Chase and any particular investor—damages present no bar to class certification.

140. Accordingly, the core issues in this litigation—whether Chase knowingly or recklessly disregarded the red flags of Ponzi activity in the Goliath accounts, whether Chase substantially assisted the fraud by continuing to provide essential banking infrastructure, and whether Chase's institutional failures caused the losses suffered by

the investor Class—can be resolved through common proof applicable to the Class as a whole, making class treatment the superior and appropriate vehicle for adjudicating this dispute.

**E. Superiority**.

141.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Although each class member paid at least thousands to dollars to invest in the relevant Goliath Joint Venture Agreements, the cost of litigation will be high.  The factual issues in this case are complex and detailed, extend over several years, and relate to many transactions.  Absent a class action, most members of the class would likely find the cost of litigating their claims individually to be prohibitively high and would have no effective remedy.

142.    Class treatment of common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote efficiency of adjudication.  Class treatment will avoid the substantial risk of inconsistent factual and legal determinations of the issues in this lawsuit.

143.    All conditions precedent to this action were performed, waived, or excused.

**CLAIMS FOR RELIEF**

**COUNT 1**

**AIDING AND ABETTING FRAUD**

On behalf of the Nationwide Class

144.    Plaintiff realleges allegations 1–143 herein.

145.    Delgado, Goliath, and its operators committed fraud.

146.    Chase provided substantial assistance by maintaining and servicing the accounts through which the scheme operated.

147.    Chase knew or should have known that the transactions were indicative of fraud.  Plaintiff and class members reasonably relied to their detriment upon Goliath and Delgado's fraud when they purchased the relevant securities.

148.    Chase had actual knowledge of Goliath's cryptocurrency Ponzi scheme.

149.    Chase knowingly and substantially assisted Goliath and Delgado in unlawfully defrauding Plaintiff and the class, in at least the following respects:

a.  Accepting for deposit funds derived from the sale of unregistered securities or an illegally operated commodities pool by an unlicensed company and unlicensed persons;

b.  Commingling investments from Goliath Joint Venture Agreement holders;

c.  Executing and condoning atypical banking procedures to service Goliath and Delgado's complex series of banking transactions;

d.   Carrying out improper and atypical financial transactions such as the transfer of millions of dollars between new investors and old investors, while Goliath and Delgado stole millions from investors;

e.   Continuing to service Goliath and Delgado after known red flags appeared in Chase alert systems that demonstrated Goliath and Delgado were engaged in unlawful conduct or conduct wholly inconsistent with the purported business model of Goliath;

    f.   Failing to identify, monitor, or exercise due diligence related to the regulatory and compliance "red flags" identified herein;

    g.   Failing to implement and adhere to compliance and monitoring protocols concerning the use of Plaintiffs and class members' investment funds; and

    h.   Failing to prevent, report, or otherwise take corrective action in response to Delgado's and Goliath's misappropriation and misuse of investor funds.

150.   In connection with providing substantial and material assistance to Goliath and Delgado, Chase was aware of its role in the Goliath Ponzi scheme and acted knowingly in assisting Goliath and Delgado.

151.   Chase substantially benefited from its participation in the Goliath Ponzi scheme. The scheme caused Goliath to earn income from fees and from investing capital derived from Goliath.

152.   As a direct and proximate result of Chase's aiding and abetting of fraud, Plaintiffs and class members have been damaged in an amount to be determined at trial.

## COUNT 2

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
On behalf of the Nationwide Class

153.   Plaintiff realleges allegations 1–143 herein.

154.   At all relevant times, Delgado was the President or CEO of Goliath.

155.   At all relevant times, Delgado maintained complete or substantially complete control over the Goliath company and Goliath investment funds. Delgado had complete or substantial control and is believed to be the sole signatory for the Chase bank accounts in which investor funds were deposited.

156.   By reason of his controlling positions, actions, and direct and indirect representations to Plaintiffs and class members, Delgado and Goliath owed them fiduciary duties of loyalty, care, and to deal honestly and in good faith. By selling

Plaintiffs and class members Joint Venture Agreements and offerings pursuant to false offering materials, and by misappropriating, commingling, and otherwise misusing investor funds, Delgado and Goliath breached fiduciary duties he owed to Plaintiffs and class members.

157.   Chase substantially assisted in Delgado's breaches of fiduciary duty with knowledge that Delgado and Goliath were breaching those duties.  The operators of Goliath owed fiduciary duties to investors as their joint venture partner, crypto pool operator, and financial advisor.

158.   The JVAs governing the Goliath investment program expressly designated investor participants as "partners" in a joint venture with Goliath.

159.   A joint venture constitutes a form of partnership in which the participants owe fiduciary duties to one another and to the enterprise.  Alternatively, fiduciary duties were owed by Goliath and Delgado as commodity trading advisors, commodity pool operators, and/or as financial advisors who had discretionary control over investors' investments.

160.   Chase, by virtue of its Know Your Customer (KYC rules) actually knew that Goliath was acting as a "private equity" cryptocurrency pool operator investing money for investors, without being licensed at all to sell these investments, whether characterized as commodities or securities and engaging in a high fraud area of finance, in cryptocurrency.  This was known to Chase, and especially its CEO Jamie Dimon, who warned for years that Crypto was being used for fraudulent and criminal activities.

161.   Those duties were breached through misappropriation of investor funds.

162.   As a direct and proximate result of Chase's aiding and abetting of breach of fiduciary duty, Plaintiffs and class members have been damaged in an amount to be determined at trial.

**COUNT 3**

**UNJUST ENRICHMENT**
On behalf of the Nationwide Class

163.   Plaintiff realleges allegations 1–143 herein.

164.   As a direct result of its facilitation of the Goliath Ponzi scheme, Chase received and retained substantial economic benefits, including account maintenance fees, wire transfer and ACH processing fees, transaction fees, and float income generated by the hundreds of millions of dollars in investor funds that flowed through the Goliath and Delgado accounts at Chase.

165.   These benefits were derived directly from investor funds deposited into the Goliath accounts by Plaintiff and Class members.  But for those deposits, the account activity generating Chase's fees and income would not have occurred.

166.   Chase accepted and retained these benefits with actual or constructive knowledge that the funds flowing through the Goliath accounts were investor funds being misappropriated through a Ponzi scheme.  Under these circumstances, Chase's retention of the fees and other financial benefits it derived from those accounts is inequitable and unjust.

167.   Plaintiff and Class members did not confer these benefits upon Chase voluntarily or with knowledge of the fraud. Equity and good conscience require Chase to disgorge and return all fees, income, and other economic benefits it received in connection with the Goliath and Delgado accounts, in an amount to be determined at trial.

**COUNT 4**

**NEGLIGENCE**
On behalf of the Nationwide Class

168.   Plaintiff realleges allegations 1–143 herein.

169.   Delgado and Chase deposited customer funds from Plaintiff and class members into Chase bank accounts.

170.   Chase knew or should have known that funds raised from Goliath investors constituted investor funds.  Chase knew or should have known that it was subject to various common law and regulatory requirements related to monitoring accounts at Chase, including regulations issued to prevent money laundering and other illicit behavior.

171.   Chase owed a duty to Plaintiffs and class members to take reasonable care with regard to the maintenance and use of investor funds on deposit at Chase.  As set forth more fully above, Chase breached this duty of care by, among other things:

   a.  Failing to employ reasonable care in connection with the maintenance and use of Goliath investor funds;

   b.  Failing to identify, monitor, or exercise requisite due diligence related to the discrepancies and inconsistencies that characterized Delgado and Goliath's deposits and outlays of investor funds;

   c.  Failing to implement and adhere to compliance and monitoring protocols concerning Goliath and Delgado's maintenance and use of investor funds;

   d.  Failing to identify, monitor, or exercise requisite due diligence related to the regulatory and compliance "red flags" detailed herein, including after the internal alerts were raised;

   e.  Failing to prevent or take any appropriate action in response to Goliath and Delgado's use of funds from new investors to pay sums owed to earlier investors;

   f.  Failing to prevent or take any appropriate action in response to Delgado's embezzlement of investor funds for personal luxuries;

   g.  Causing and allowing investor funds to be misappropriated and misused; and

h. Failing to notify investors or any governmental entity or regulator of Goliath's and Delgado's misappropriation and misuse of investor funds.

172. The breaches described above constitute negligence amounting to bad faith.

173. Chase's breaches of its duty of care to Plaintiff and class members caused them reasonably foreseeable harm.

174. The policy of preventing future harm strongly disfavors application of the economic loss rule, particularly given the moral blame attached to abetting investment fraud. Plaintiff and class members did not enter into contracts with Chase and, thus, seek recovery in tort. There is a high degree of certainty that Plaintiff and class members suffered injuries, and those injuries were highly foreseeable to Chase. The transactions associated with Goliath's Chase accounts were intended to, and did, directly affect the investors who had been promised returns and delivery of principal.

175. As a direct and proximate result of Chase's negligence, Plaintiff and class members have lost all or most of the money they paid to Delgado and Chase, have been denied the use of their assets since making those investments, and have been damaged thereby, in an amount to be determined at trial.

**COUNT 5**

**VIOLATIONS OF THE UNFAIR COMPETITION LAW,**

**Cal. Bus. & Prof. Code § 17200 et seq. ("UCL")**

**On behalf of the California Subclass**

176. Plaintiff realleges allegations 1–143 herein.

177. The Unfair Competition Law ("UCL") forbids any unlawful, unfair, or fraudulent business act or practice.

178. Chase's conduct is unlawful, and violative of the UCL, because it violates the common laws of aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and negligence. Additionally, Chase's conduct is unlawful because Chase failed to comply with relevant BSA and AML regulations, including those requiring

development and implementation of a program to ensure adequate due diligence of banking customers and their account activity.

179.    Chase's conduct also is unfair in violation of the UCL by reason of its immoral, unethical, oppressive, unscrupulous, and substantially injurious actions and inaction, including:

a.  Failing to take corrective action after viewing internal alerts that were or should have been generated given the account activity and the Know Your Customer rules in banking, as well as AML regulations and Chase's own internal policies and procedures;

b.  Failing to take corrective action in response to the panoply of other irregular banking activities detailed above;

c.  Knowingly allowing Delgado to misappropriate and misuse investor funds; and

d.  Failing to properly implement and adhere to mandatory BSA and AML protocols.

180.    The gravity of the harm resulting from Chase's unfair conduct outweighs any potential utility of the conduct.  Chase's failure to take appropriate and necessary steps to protect investors, even in the face of known red flags and internal alerts, harms the public at large and forms part of a common and uniform course of wrongful conduct. There are reasonably available alternatives that would have furthered Chase's business interests, such as immediately reporting the suspicious account transactions and other atypical activities associated with Goliath's and Delgado's accounts to banking regulators, the CFTC, the NFA and state and local securities regulators.

181.    The harm from Chase's unfair conduct was not reasonably avoidable by investors.

182.    Plaintiffs and the class suffered injury in fact, and lost money or property, as a direct and proximate result of Chase's unlawful and unfair conduct.  Plaintiffs

accordingly seek restitution as provided for under Cal. Bus. & Prof. Code § 17203, in addition to reasonable attorneys' fees and costs.

### **PRAYER FOR RELIEF**

183.        WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully requests that the Court enter judgment in their favor and grant the following relief:

a. Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative, and appoint Plaintiff's counsel as Class Counsel;

b. Enter judgment in favor of Plaintiff and the Class and against Defendant on all claims asserted herein;

c. Award compensatory damages in an amount to be determined at trial for all losses suffered by Plaintiff and members of the Class as a result of Defendant's wrongful conduct;

d. Award consequential damages, including damages resulting from the loss of investment opportunity and the loss of the use of invested capital;

e. Order disgorgement and restitution of all fees, compensation, and benefits Defendant received in connection with the structuring, documentation, or validation of the Goliath enterprise;

f. Impose a constructive trust and order an equitable accounting for any funds, fees, or benefits wrongfully obtained by Defendant in connection with the Goliath enterprise;

g. Award rescission or rescissory damages to restore Plaintiff and members of the Class to the financial position they would have occupied absent Defendant's misconduct;

h. Grant equitable relief as necessary to remedy Defendant's misconduct and to restore Plaintiff and the Class to the financial position they would have occupied absent Defendant's wrongdoing;

i. Award pre-judgment and post-judgment interest as permitted by law;

j. Award Plaintiff and the Class their reasonable attorneys' fees, litigation costs, and expenses where permitted by law; and

k. Grant such other and further relief as the Court deems just and proper.

# **DEMAND FOR JURY TRIAL**

Plaintiffs request a jury trial for any counts for which a trial by jury is permitted by law.

Dated: March 10, 2026

Respectfully submitted,

*/s Zachary D. Ludens,*
CA State Bar No.: 360153
**SHAW LEWENZ**
ZACHARY D. LUDENS, ESQ.
Cal. Bar. No. 306135
95 Third Street, Second Floor
San Francisco, CA 94103
Telephone: (954) 361-3633
Facsimile: (954) 989-7781
Primary Email: zludens@shawlewenz.com
Secondary Email: kackerman@shawlewenz.com

**SHAW LEWENZ**
110 SE 6th St., Suite 2900
Fort Lauderdale, FL 33301
JORDAN A. SHAW, ESQ.
(*pro hac vice* application forthcoming)
Florida Bar No. 111771
GABRIEL E. MORALES Esq.
(*pro hac vice* application forthcoming)
Florida Bar No. 1038778
Primary Email: jshaw@shawlewenz.com; gmorales@shawlewenz.com
Secondary Email: mlomastro@shawlewenz.com

**SONN LAW GROUP PA**
19495 Biscayne Blvd Suite 607
Aventura, FL 33180
Tel 305-912-3000
Fax 786-485-1510
Primary Email: Jsonn@sonnlaw.com
Secondary Email: service@sonnlaw.com
Jeffrey R. Sonn, Esq.
Fla Bar No 773514
(*pro hac vice* application forthcoming)
Brian Pastor, Esq.
Fla Bar No 998826
(*pro hac vice* application forthcoming)

**ADAM A. SCHWARTZBAUM, P.A.**
Adam A. Schwartzbaum, Esq.
Fla. Bar No. 93014
14 NE 1st Ave Suite 705
Miami, FL 33132
adam@schwartzbaum.com
Tel: 305-725-1245
(*pro hac vice* application forthcoming)

**Murphy's Law: The Crypto Law Firm**
T. Liam Murphy, Esq.
N.Y. Bar No 5853759
353 Lexington Avenue
4th Floor, Suite 400
New York, New York 10016
liam@murphyslawcrypto.com
Tel: 913-575-0540
(*pro hac vice* application forthcoming)