**BEFORE THE UNITED STATES
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

IN RE: GOLIATH VENTURES
BANK LITIGATION

MDL Docket No. __26-16__

_____ /

## BRIEF IN SUPPORT OF MOTION FOR TRANSFER OF ACTIONS
## TO THE NORTHERN DISTRICT OF CALIFORNIA PURSUANT TO 28 U.S.C. § 1407
## FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS

Petitioners, Robby Alan Steele and Eric Logwood ("Petitioners"), file this Brief in Support of their Motion to Transfer to the United States District Court for the Northern District of California for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.

Petitioner Steele filed the first-filed class action against one of the two banks that enabled a $328 million Ponzi scheme perpetrated by Goliath Ventures, Inc. ("Goliath"): JPMorgan Chase Bank, N.A. ("Chase"). Petitioners' counsel organized victims in the immediate aftermath of Goliath's CEO Christopher A. Delgado's arrest by the Department of Justice, secured the appointment of a Receiver over Goliath, and developed a coordinated litigation strategy that produced the nation's first bank-liability class action arising from the Goliath scheme—*Steele v. JPMorgan Chase Bank, N.A.*, Case No. 4:26-cv-02067-KAW (N.D. Cal.) (the "*Steele* Action"), filed March 10, 2026. Petitioner Logwood brought similar claims in a class action against Bank of America, N.A. ("Bank of America"): *Logwood v. Bank of America, N.A.*, No. 2:26-cv-00820 (D. Nev.) (the "*Logwood* Action"). Petitioners and their counsel have great respect for the multidistrict litigation process and submit that centralization in the Northern District of California is the most efficient path forward for the bank liability claims. Petitioners submit that non-bank liability claims should not be consolidated, as they are distinctly different claims and not overlapping.

1

After the *Steele* Action was filed against Chase, a later-filed class action naming both Chase and Bank of America was filed in the Southern District of Florida by separate counsel, and Petitioners filed the *Logwood* Action against Bank of America in the District of Nevada. These three actions assert overlapping aiding-and-abetting bank-liability claims against the same two banks, arise from the same Ponzi scheme, target the same bank accounts, and will require substantially identical discovery.

Without centralization, the parties and the judiciary face duplicative discovery demands, competing class actions, the risk of inconsistent pretrial rulings on critical issues including class certification, *Daubert* motions, and the scope of the banks' duties. Moreover, additional bank-liability actions are also likely to be filed as further victims investigate the banking channels through which the Goliath scheme operated, and indeed, multiple other counsel have already contacted Steele's counsel seeking to get involved. Such actions may name banks other than the currently named defendants but will nevertheless require discovery into the same underlying Ponzi scheme, the same investor flow of funds, and the same alleged compliance failures. Early centralization will prevent the proliferation of overlapping proceedings and inconsistent rulings across multiple districts.

Petitioners respectfully submit that centralization is warranted and that the Northern District of California is the most appropriate transferee forum.

## FACTUAL BACKGROUND

### A. The Goliath Ventures Ponzi Scheme

For approximately three years, Christopher Alexander Delgado ("Delgado") and his company, Goliath, operated a cryptocurrency investment fraud of massive proportions. Goliath solicited investors with promises of guaranteed monthly returns of 3–8% from purported cryptocurrency liquidity pool investments. A "liquidity pool" is commonly described as a pool of

2

digital assets locked into a software-based mechanism that allows trading on decentralized exchanges (including by pairing assets such as stablecoins and cryptocurrencies). In theory, liquidity providers may earn fees tied to trading volume. Liquidity-pool returns are inherently variable and exposed to market volatility.  In reality, however, Goliath operated as a classic Ponzi scheme: rather than investing in liquidity pools, Goliath used new investor funds to pay older investors, while siphoning millions for personal expenditures in the United States and Dubai—including luxury real estate purchases, designer jewelry, luxury vehicles, and extravagant travel.

Between 2022 and early 2026, Goliath raised at least $328 million from investors across the United States and Canada. Witnesses are thus disbursed far and wide. Investors were told their money would be placed in cryptocurrency liquidity pools; instead, it was funneled through traditional bank accounts at Chase and Bank of America. Goliath's marketing campaign and referral network were aggressive and far-reaching. Investors received monthly statements, had access to online portals that purportedly displayed real-time account performance, and were given joint venture agreements—all of which were false.

The fraud required the banking system to function. Investors wired dollars to Goliath's business bank accounts. These funds were often then transferred from the banks to cryptocurrency exchanges like Coinbase. The scheme collapsed when the Department of Justice arrested Delgado on February 24, 2026, charging him with wire fraud and money laundering. The government is pursuing forfeiture of Delgado's personal assets.

**B.  The Banks Were the Central Infrastructure of the Fraud**

The Goliath Ponzi scheme could not have operated without the banking infrastructure provided by Chase and Bank of America. Goliath maintained a business bank account at Chase (ending in 0305) through which approximately $253 million in investor funds flowed between January 2023 and June 2025. Delgado was the sole signatory on the Chase account and had full

control over it. He used the Chase account to receive investor deposits, pay purported returns to existing investors, purchase luxury real estate (including a property transfer exceeding $350,000 in Sanford, Florida), and fund personal and corporate expenditures.

After the Chase account was closed or restricted, Goliath opened a business bank account at Bank of America (ending in 9136), through which approximately $75 million in investor funds flowed between May 2025 and September 2025. Delgado used the Bank of America account in the same manner: receiving investor deposits, paying purported returns, purchasing additional luxury real estate, and funding personal and corporate spending.

Both banks were subject to extensive federal regulatory obligations—including the Bank Secrecy Act ("BSA"), Anti-Money Laundering ("AML") laws, and Know Your Customer ("KYC") requirements—that required them to "Know Your Customer", monitor Goliath's accounts, identify suspicious activity, and file Suspicious Activity Reports ("SARs") with the Financial Crimes Enforcement Network. Bank knowledge of the fraud was gleaned from large round-dollar transfers, unexplained repetitive transaction patterns, large cash withdrawals, funds flowing from investors directly back to other investors, personal purchases from a business account, and an account structure inconsistent with Goliath's purported liquidity pool crypto business. All three complaints in this litigation identify the same constellation of money laundering red flags, drawn from the same FFIEC examination standards, and allege that both banks knew that Goliath was operating a fraud.

## C. Petitioners' Counsel's Leadership in the Goliath Litigation

Undersigned counsel were the first attorneys in the nation to act on behalf of Goliath investors. Jordan A. Shaw of Shaw Lewenz began investigating claims and filed the first state court lawsuits against Goliath on January 23, 2026, on behalf of defrauded investors almost a

4

month before Delgado's arrest. Indeed, the Shaw Lewenz firm filed four lawsuits against Goliath prior to seeking and obtaining a receiver over Goliath.

Immediately following the DOJ arrest of Delgado on Tuesday, February 24, 2026, the firms of Schwartzbaum, Sonn Law Group, and Murphy's Law began speaking with victims nationwide, organizing cases, and identifying viable third-party targets for class action litigation.

On Friday, February 27, 2026—three days after Delgado's arrest—Petitioners' Counsel filed an emergency motion to appoint a Receiver for Goliath. Just four days later, on March 3, 2026, Petitioners' Counsel obtained an order appointing Michael Budwick of Meland Budwick as Receiver for Goliath. While Mr. Budwick traveled to Orlando to take control of Goliath's books and records, Petitioners' Counsel worked with victims to develop a strategic litigation plan designed to complement the Receiver's efforts.  That plan has thus far produced four targeted class actions, filed in deliberate sequence against distinct defendants in appropriate forums.

First, on March 5, 2026, two days after the receivership order was entered, Petitioners' Counsel filed *Euliano v. Alston & Bird LLP*, No. 26:cv-60646, in the Southern District of Florida, alleging legal malpractice, breach of fiduciary duty, and constructive fraud against the law firm that served as counsel and prepared the operative Goliath joint venture agreements.

Second, on March 10, 2026, Petitioners' Counsel filed *Steele v. JPMorgan Chase Bank, N.A.* in the Northern District of California on behalf of a California resident. This was the first-filed class action in the country to assert bank-liability claims arising from the Goliath scheme. The complaint is a detailed, 37-page pleading supported by extensive factual allegations regarding Chase's aiding and abetting liability.

Third, on March 17, 2026, Petitioners' Counsel filed *Presta v. Broad Financial LLC*, No. 2:26-cv-02721, in the District of New Jersey, asserting claims against a company for its distinct

5

role in facilitating the scheme through self-directed retirement accounts—a separate theory of liability involving different conduct and different discovery.

Fourth, on March 19, 2026, Petitioners' Counsel filed *Logwood v. Bank of America, N.A.* in the District of Nevada on behalf of a Nevada resident, asserting aiding-and-abetting claims against Bank of America for providing banking infrastructure for the later phase of the scheme.

These actions reflect a deliberate, months-long litigation strategy. Each action targets a distinct defendant with distinct legal theories in an appropriate forum. The bank-liability actions were filed in jurisdictions where Petitioners had standing and where the applicable law most effectively addresses the claims at issue.

### D. The Later-Filed, Duplicative South Florida Bank Action

Despite nationwide press coverage of the first-filed action, on March 17, 2026—more than a week after Petitioners filed the first bank-liability action in California—a separate group of plaintiffs represented by different counsel filed *Roshwald, et al. v. JPMorgan Chase Bank, N.A., et al.*, No. 1:26-cv-21776 (S.D. Fla.) (the "*Roshwald* Action"). *Roshwald* names both Chase and Bank of America as defendants and asserts aiding-and-abetting fraud and aiding-and-abetting breach of fiduciary duty claims. Unlike the *Steele* and *Logwood* complaints, the *Roshwald* complaint contains materially fewer specific facts against each banking institution and lumps both banks into the same counts as though they are the same entity (as opposed to facts/counts directed at the specific conduct of each institution). However, in most respects, the *Roshwald* complaint is like the *Steele* complaint. It identifies the same Chase account (ending in 0305) and the same Bank of America account (ending in 9136), describes the same pattern of suspicious transactions, recites the same FFIEC concerns, and alleges the same BSA/AML/KYC compliance failures. It seeks to represent a competing putative nationwide class of Goliath investors against the same bank

6

defendants. It alleges the same core causes of action Petitioners had already asserted in the first-filed *Steele* Action. The factual overlap is obvious.[1]

The filing of the *Roshwald* Action demonstrates precisely why centralization is needed. Without coordination, the investor class faces the prospect of two competing nationwide class actions in different federal districts, asserting overlapping claims against the same defendants, pursuing the same bank records and the same witnesses—with the attendant risks of duplicative discovery, inconsistent class certification rulings, and fragmented litigation that would dilute investor recovery.

### E. The Receivership and Bankruptcy

The Goliath Receiver was appointed on March 3, 2026. The Receiver filed a Petition for Chapter 11 Bankruptcy in the Southern District of Florida on March 16, 2026. *See In re Goliath Ventures, Inc.*, No. 2026-bk-13174 (Bankr. S.D. Fla.). Claims against Goliath directly—including the class action filed by Roshwald's counsel—are automatically stayed per 11 U.S.C. § 362. According to the filing, twenty percent (20%) of the creditors listed in the initial schedule of largest creditors in the Bankruptcy are represented by at least one of the Petitioner's Counsel.

The bank-liability claims at issue in this Motion are *not* subject to the automatic stay. They are asserted against non-debtor financial institutions and arise from the banks' own independent misconduct, not from Goliath's obligations. The Panel has consistently held that claims against non-debtor third parties may be centralized in a district other than the bankruptcy forum. *See In re*

---

[1] On March 11, 2026—eight days after the receiver was appointed on March 3, 2026, and for which there had been substantial press coverage—Roshwald's counsel filed a class action directly against Goliath and Delgado. *See T&C Investing, LLC, et al. v. Goliath Ventures, Inc., et al*, No. 26-cv-21612 (S.D. Fla.). Roshwald's counsel did not seek leave of court to pursue claims implicating the Receivership Estate, even though the Receivership Order expressly required such leave and the Receiver was the only proper party to assert those claims. *See Patel v. Goliath Ventures, Inc.*, No. 26-00310 ¶ 32 (Fla. 17th Jud. Cir. Mar. 3, 2026) (Order on Plaintiff's Emergency Verified Ex Parte Motion to Appoint Receiver).

*Franklin Nat'l Bank Sec. Litig.*, 393 F. Supp. 1093, 1095 (J.P.M.L. 1975) (holding transfer of bank-liability actions "would in no way affect operation of [the bankruptcy] stay" and "the question of the effect of the bankruptcy stay and any modification thereof [is] entirely a problem to be worked out by the transferee court, the bankruptcy court and the parties"); *In re Medical Capital Sec. Litig.*, 706 F. Supp. 2d 1378, 1380 (J.P.M.L. 2010) (centralizing Ponzi-scheme broker-dealer claims in California notwithstanding receiver in the same district).

## LEGAL ARGUMENT

### I.   TRANSFER AND CONSOLIDATION OF THE RELATED ACTIONS IS APPROPRIATE PURSUANT TO 28 U.S.C. § 1407

Pursuant to 28 U.S.C. § 1407(a), the Panel may transfer civil actions "involving one or more common questions of fact" that are "pending in different districts" to "any district for coordinated or consolidated pretrial proceedings" upon its determination that such transfers "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." Each of these requirements is met here.

### A.  The Related Actions Involve Common Questions of Fact

The Panel does not require a complete identity of common factual issues or parties as a prerequisite to transfer. *See In re FTX Cryptocurrency Exch. Collapse Litig.*, 677 F. Supp. 3d 1379, 1381 (J.P.M.L. 2023). "The presence of additional facts or differing legal theories is not significant where" the actions "still arise from a common factual core." *Id.* (citing *In re Auto Body Shop Antitrust Litig.*, 37 F. Supp. 3d 1388, 1390–91 & n.5 (J.P.M.L. 2014)). Moreover, "the existence of common legal, as opposed to factual, questions is not a prerequisite to centralization." *Uber Techs., Inc. v. United States Judicial Panel on Multidistrict Litig.*, 131 F.4th 661, 671 (9th Cir. 2025).

8

The common factual core here is self-evident. All three Related Actions arise from the same underlying scheme—the Goliath Ventures Ponzi scheme—and target the same two financial institutions' roles in facilitating that scheme through the banking system. They share many common factual questions, as outlined below.

### 1. The Operation and Monitoring of Goliath's Bank Accounts

All three actions will require discovery into the same bank accounts—Chase Account 0305 and Bank of America Account 9136. Each action alleges that the banks failed to properly monitor these accounts and ignored red flags of fraud. The account-opening documents, transaction records, internal monitoring reports, and compliance records for these specific accounts will be central to every action. *See In re Great W. Ranches Litig.*, 369 F. Supp. 1406, 1407 (J.P.M.L. 1974) (finding transfer warranted where "factual issues relating to [the company's] financial affairs are also common to the other actions in this litigation").

### 2. The Banks' Knowledge of the Fraud

Each action alleges that Chase and Bank of America knew or should have known that Goliath was operating a Ponzi scheme. This is the central factual dispute in every case, and it will require the same discovery: internal bank communications, compliance escalation records, SAR filings (or failures to file), KYC due diligence files, and the testimony of the same bank compliance officers, relationship managers, and senior executives. All three complaints identify the same FFIEC red flags—large round-dollar transfers, unexplained repetitive patterns, commingling of investor and personal funds, new investor deposits used to pay existing investors—visible in the banks' own records.

### 3. Movement and Tracing of Investor Funds

All actions will require forensic tracing of investor funds through the banking system—from investor wire transfers, through the Goliath accounts, to cryptocurrency exchanges, to purported investor "returns," and to Delgado's personal expenditures. This fund-tracing analysis will depend on the same underlying bank records and will require the same forensic accounting expertise. Duplicating this work across three districts would be wasteful and unnecessary.

### 4. Uniform Regulatory and Compliance Obligations

All three actions assert that the banks breached their obligations under the BSA, AML regulations, KYC requirements, and FFIEC guidelines. The factual inquiry into the banks' compliance programs—their internal controls, monitoring systems, escalation procedures, and training protocols—will be substantially identical across all actions. Expert testimony regarding banking compliance standards will be common to every case.

### 5. Competing Class Allegations

All three actions seek to represent putative nationwide classes of Goliath investors. The *Steele* and *Roshwald* actions assert directly competing nationwide classes against Chase. The *Logwood* and *Roshwald* actions assert overlapping classes against Bank of America. The damages model in each action will depend on the same forensic analysis of fund flows through the banking system. *See In re Plumbing Fixture Cases*, 298 F. Supp. 484, 493 (J.P.M.L. 1968) ("[I]t is in the field of class action determinations in related multidistrict civil actions that the potential for conflicting, disorderly, chaotic judicial action is the greatest."); *In re Imagitas, Inc., Drivers' Privacy Prot. Act Litig.*, 486 F. Supp. 2d 1371, 1372 (J.P.M.L. 2007) (centralizing actions with "competing class allegations"). Further, the Panel has emphasized that centralization is especially warranted where actions involve "competing and overlapping class actions in multiple federal

districts." *In re FTX Cryptocurrency Exch. Collapse Litig.*, 677 F. Supp. 3d at 1382 (granting centralization because it would "eliminate duplicative discovery; prevent inconsistent pretrial rulings, especially with respect to class certification and Daubert motions; and conserve the resources of the parties, their counsel and the judiciary").

### B.  Centralization Will Serve the Convenience of Parties and Witnesses

Without centralization, Chase and Bank of America will face competing discovery demands in three separate federal districts for the same documents, the same transaction records, and the testimony of the same bank witnesses. The banks' compliance officers, AML personnel, relationship managers, and senior executives will be subject to duplicative deposition demands. Without centralization, each bank will face repetitive and potentially inconsistent discovery rulings on privilege, scope, and protective orders.

Centralization before a single transferee judge will eliminate this burden. *See Uber Techs.*, 131 F.4th at 671 (centralization warranted where "[e]ach case involved substantially identical and duplicative discovery" and defendant "would have been required to produce the same documents and corporate witnesses in potentially hundreds of individual actions across numerous judicial districts"); *In re Merrill Lynch & Co., Inc., Research Reports Sec. Litig.*, 223 F. Supp. 2d 1388, 1389 (J.P.M.L. 2002) ("Centralization under Section 1407 is thus necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings (especially with respect to questions of class certification), and conserve the resources of the parties, their counsel and the judiciary.").

### C.  Centralization Will Promote the Just and Efficient Conduct of the Actions

The risk of inconsistent pretrial rulings is particularly acute here. Three courts in three circuits could reach conflicting conclusions on the following critical issues:

**Motions to Dismiss:** The banks will likely file motions to dismiss in each jurisdiction, raising overlapping legal arguments regarding the sufficiency of the aiding-and-abetting allegations and the scope of the banks' duties. Conflicting rulings would undermine the efficient resolution of the litigation.

**Class Certification:** The *Steele* and *Roshwald* actions assert directly competing putative nationwide classes against Chase. If different courts certify different classes with different definitions, or if one court certifies a class while another denies certification, the result will be chaos for the nationwide investor class. *See In re IDT Corp. Calling Card Terms Litig.*, 278 F. Supp. 2d 1381, 1381 (J.P.M.L. 2003) (centralizing "overlapping putative class actions").

**Daubert Motions:** All actions will require expert testimony on banking compliance, fund tracing, and damages. Inconsistent *Daubert* rulings on substantially identical expert evidence would create irreconcilable conflicts and wasteful duplication of expert work.

Centralization is also important for protecting the integrity of investor recoveries. Fragmented litigation across multiple districts will increase costs, multiply motion practice, and create opportunities for inconsistent rulings that could undermine the class's ability to recover from the banks. A single transferee judge with a comprehensive understanding of the Goliath scheme and the banks' roles will be best positioned to manage pretrial proceedings efficiently and ensure that the litigation serves the interests of the investor class.

Finally, additional tag-along actions are likely. The Goliath scheme affected investors across the country, and as public awareness grows, further lawsuits against Chase and Bank of America, and possibly other banks involved in the fraud, are to be expected. Ordering centralization now will allow the Panel to manage these anticipated filings through the conditional

transfer order process. *See In re FTX Cryptocurrency Exch. Collapse Litig.*, 677 F. Supp. 3d at 1380 (anticipating and providing for tag-along actions).

The rationale for centralization applies not only to additional actions against the presently named bank defendants, but also to actions asserting similar claims against other banking institutions that maintained accounts for Goliath, processed investor transactions, or otherwise participated in the banking infrastructure through which the scheme operated. Discovery concerning the scheme, tracing of investor funds, identification of red flags, and interpretation of industry compliance standards will substantially overlap regardless of which bank is named as a defendant. Centralizing such actions will therefore advance the core purposes of 28 U.S.C. § 1407.

### D.   This MDL Should Be Narrowly Defined

Petitioners seek transfer of only those actions asserting aiding-and-abetting or related claims against Chase and/or Bank of America arising from the Goliath scheme. Petitioners expressly do *not* seek inclusion of:

(a) *T&C Investing, LLC*: direct claims against Goliath and Delgado (claims against Goliath claims are currently stayed);

(b) *Euliano*: legal malpractice and breach of fiduciary duty claims against the joint venture's outside counsel, involving entirely different witnesses and evidence;

(c) *Presta*: claims against an IRA entity formation company, which involves a subclass of Goliath investors, different regulatory frameworks, and different discovery.

This disciplined approach reflects the Panel's consistent preference for narrowly scoped MDLs over sprawling mega-proceedings. *See In re Cash Sweep Programs Contract Litig.*, 766 F. Supp. 3d 1346, 1349 (J.P.M.L. 2025) (denying centralization of industry-wide litigation where common factual issues were "minimal" and claims were "defendant-specific"); *In re National Ski Pass Ins. Litig.*, 492 F. Supp. 3d 1352, 1354 (J.P.M.L. 2020) (declining industry-wide MDL in

13

favor of defendant-specific centralization because "creating [an industry-wide] MDL . . . would seem to complicate, rather than streamline, pretrial proceedings"). Unlike those cases, the actions here involve the same defendants, the same accounts, and the same discovery—making centralization both appropriate and efficient.

Any argument that this MDL should be expanded to encompass all Goliath-related litigation—including claims against Delgado, Alston & Bird, or Broad Financial—should be rejected. Those actions involve different defendants, different legal theories, and largely non-overlapping discovery. Including them would transform a focused, manageable MDL into an unwieldy proceeding with minimal efficiency gains. Again, the Panel has warned against over-inclusive MDLs. *See In re Cash Sweep Programs Contract Litig.*, 766 F. Supp. 3d at 1349 (denying centralization of industry-wide litigation against unrelated defendants); *In re National Ski Pass Ins. Litig.*, 492 F. Supp. 3d at 1354 (declining to centralize claims against competing defendants where "creating [an industry-wide] MDL . . . would seem to complicate, rather than streamline, pretrial proceedings").

## II. THE NORTHERN DISTRICT OF CALIFORNIA IS THE MOST APPROPRIATE TRANSFEREE FORUM

The Panel has broad discretion in selecting the transferee district and considers multiple factors, including the location of pending actions, the first-filed action, the accessibility of the forum, the experience of potential transferee judges, and the nexus between the litigation and the proposed forum. Indeed, Gibbs Mura, one of the two firms representing Roshwald, has offices in the Northern District of California. Each of these factors favors the Northern District of California.

14

## A. The First-Filed Bank-Liability Action Is Pending in the Northern District of California

The Panel has consistently given significant weight to the location of the first-filed action when selecting a transferee district. *See In re FTX Cryptocurrency Exch. Collapse Litig.*, 677 F. Supp. 3d at 1382 (selecting district where first-filed, most advanced action was pending and where judge was "experienced"); *In re Medical Capital Sec. Litig.*, 706 F. Supp. 2d at 1380 (selecting district where "[t]hree of the four actions are already consolidated before [the transferee judge]"); *In re Capital Underwriters, Inc. Sec. Litig.*, 464 F. Supp. 955, 957 (J.P.M.L. 1979) (selecting Northern District of California where "more extensive discovery and other pretrial proceedings had proceeded in the actions" and judge was "thoroughly acquainted with the factual background of all the actions").

*Steele* was the first-filed class action in the country to assert bank-liability claims arising from the Goliath scheme. It was filed on March 10, 2026—a more than a week before the *Roshwald* Action in the Southern District of Florida and nine days before the *Logwood* Action in Nevada. The *Steele* complaint is a detailed, 37-page pleading with extensive factual allegations. Petitioners' Counsel are actively engaged in the litigation and prepared to move forward expeditiously. Petitioners' Counsel have already, in compliance with the local rules, filed its diversity statement and pro-hac vice admissions for those lawyers not admitted in California. Each of them has already been granted. The suit was served on Chase on March 20, 2026.

## B. The Northern District of California Provides Geographic Neutrality

The putative class of Goliath investors is dispersed across the United States and Canada. No single state can claim to be the home jurisdiction of the class. The Northern District of California provides a geographically neutral forum for this nationwide litigation, accessible to parties and witnesses from all regions.

15

By contrast, the Southern District of Florida is not the site of the Ponzi scheme itself (which was based in Orlando, Florida, in the Middle District of Florida). The Southern District of Florida is not the most appropriate forum for the *bank-liability* litigation. This MDL is not about Delgado's conduct in Orlando. It is about the *banks'* conduct: their compliance monitoring, their internal decision-making, and their processing of hundreds of millions of dollars in suspicious transactions. The relevant bank conduct was not localized in the Southern District of Florida; instead, the banks processed deposits received from investors' banks from all over the country and Canada.

The Panel has recognized the importance of selecting a neutral forum where the underlying scheme occurred in one district, but the claims target third-party defendants. *See In re Great W. Ranches Litig.*, 369 F. Supp. 1406, 1407 (J.P.M.L. 1974) (centralizing claims against a bank in the Northern District of California rather than in the district where the underlying fraud originated); *In re National Ski Pass Ins. Litig.*, 492 F. Supp. 3d at 1355 (creating defendant-specific MDL in the Northern District of California rather than centralizing all claims in a single forum). It should do the same here.

### C. Significant Evidence Has a Nexus to California

The Goliath scheme involved the transfer of investor funds through cryptocurrency exchanges, including Coinbase—which is headquartered in the Northern District of California. The fintech infrastructure through which investor funds were processed has substantial connections to the Bay Area's financial technology ecosystem. Both Chase and Bank of America maintain significant compliance operations and technology infrastructure in California, and records related to the processing and monitoring of Goliath's transactions are accessible through California-based systems and personnel. California holds the title for the U.S. State with the most retail banking locations for *both* Chase *and* Bank of America. Chase bank has approximately 850

16

locations in California with only about 400 in Florida. And, with approximately 752 locations, almost 20% of all Bank of America locations are in California.

Moreover, while not a defendant, a primary issue and the likely target of substantial third-party discovery in this case will be bank transfers to and from a popular cryptocurrency exchange known as "Coinbase." Coinbase maintains a corporate office is in San Francisco, California, where it opened a new 150,000 sq. ft. office in Mission Rock in 2025. Coinbase does not maintain any physical office in Florida. The Panel has selected the Central and Northern Districts of California as transferee forums in Ponzi-scheme litigation where the relevant records, witnesses, and operational infrastructure are in the district. *See, e.g., In re Medical Capital Sec. Litig.*, 706 F. Supp. 2d at 1380.

**D. The Northern District of California Has Extensive Experience with Complex Financial and Cryptocurrency Litigation**

The Northern District of California is one of the nation's most experienced courts for complex financial, technology, and cryptocurrency litigation. Its judges routinely manage large-scale MDL proceedings and are deeply familiar with the fintech, digital asset, and banking compliance issues that permeate this litigation. The Panel has repeatedly selected the Northern District of California as the transferee forum for complex financial MDLs. *See, e.g., In re Capital Underwriters, Inc. Sec. Litig.*, 464 F. Supp. at 957 (selecting Northern District of California for securities fraud MDL where judge had "become thoroughly acquainted with the factual background"); *In re National Ski Pass Ins. Litig.*, 492 F. Supp. 3d at 1355 (centralizing insurance claims in Northern District of California where one action was pending and "claims processor was based in California").

Courts within the Ninth Circuit have extensive experience adjudicating complex aiding-and-abetting claims involving financial institutions in large fraud cases, including claims requiring

17

analysis of banks' compliance with BSA, AML, and KYC obligations. This institutional expertise will promote efficient pretrial management and reduce the likelihood of protracted litigation over novel legal issues.

### E. The Northern District of California Is Readily Accessible

San Francisco is a major international transportation hub readily accessible from all parts of the country. The Panel has recognized the accessibility of the Northern District of California as a factor in transferee-forum selection. *See In re Medical Capital Sec. Litig.*, 706 F. Supp. 2d at 1380 (selecting California as transferee forum for nationwide Ponzi-scheme litigation).

### F. The Receiver's and Bankruptcy Court's Location in Florida Does Not Require a Florida Transferee Forum

The pendency of the bankruptcy proceedings in the Southern District of Florida does not compel centralization of the bank-liability claims in that district. Claims against non-banking institutions raise distinct legal and factual issues that will not be resolved in the bankruptcy proceeding. The Panel has repeatedly centralized non-debtor litigation in districts other than the bankruptcy forum, recognizing that coordination between the transferee court and the bankruptcy court can be accomplished without venue identity. *See In re Franklin Nat'l Bank Sec. Litig.*, 393 F. Supp. at 1095–96 (centralizing bank-liability actions in a district other than the bankruptcy forum); *In re Medical Capital Sec. Litig.*, 706 F. Supp. 2d at 1380 (same).

Finally, the Panel should favor the Northern District of California over the Southern District of Florida. Although Orlando, Florida is where the scheme was operated, this MDL is not about the scheme—it is about the *banks.* The relevant inquiry concerns the banking transactions, monitored accounts, and compliance decisions, not where Delgado spent investors' money. The principal operations and compliance center for Chase is in New York, and for Bank of America, it

is in North Carolina, not in Florida. The nationwide investor class has no special connection to Florida. And the key third-party discovery target—Coinbase—has an office in San Francisco.

In *In re Great Western Ranches Litigation*, the Panel centralized bank-liability claims in the Northern District of California rather than in the district where the underlying fraud was committed because the relevant records and proceedings were in California. 369 F. Supp. at 1407. The same logic applies here.

### III.     PROPOSED STRUCTURE OF THE MDL

Petitioners propose a streamlined MDL limited to bank-liability claims, with the following features:

**Coordinated Discovery.** Because the claims against Chase and Bank of America arise from the same underlying scheme, involve the same bank accounts, and will require the same categories of documents and witnesses, a unified discovery schedule will produce substantial efficiencies. The transferee judge may establish limited bank-specific discovery sub-tracks as needed.

**Unified Pretrial Schedule.** A single pretrial schedule for motions to dismiss, class certification, and *Daubert* proceedings will prevent inconsistent rulings and conserve resources.

**Coordination with Receiver.** Petitioners are committed to coordinating with the Receiver/Custodian to ensure that the bank-liability litigation complements—rather than interferes with—his recovery efforts. Petitioners' Counsel have been working cooperatively with the Receiver/Custodian since the inception of these proceedings and will continue those efforts throughout the litigation.

**Tag-Along Action Management.** Petitioners anticipate that additional bank-liability actions may be filed as the Goliath proceedings progress. Early centralization will allow the Panel to manage these filings through the conditional transfer order process.

19

Petitioners have already demonstrated their ability to coordinate complex, multi-defendant Goliath litigation through their strategic filing of four targeted class actions. Petitioners are committed to cooperating with any leadership structure the Panel deems appropriate and to working with the transferee judge to ensure efficient pretrial management.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Panel:

(1)  Transfer all present and future actions asserting aiding-and-abetting or related claims against financial institutions arising from the Goliath Ventures, Inc. Ponzi scheme, including JPMorgan Chase Bank, N.A. and Bank of America, N.A., to the Northern District of California for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407;

(2)  Assign the coordinated proceedings to the judge presiding over the first-filed *Steele* Action in the Northern District of California; and

(3)  Grant such other and further relief as the Panel deems just and proper.

Dated: March 27, 2026

Respectfully submitted,

By: */s/ Adam A. Schwartzbaum*
Adam A. Schwartzbaum, Esq.

| SCHWARTZBAUM | SHAW LEWENZ |
|---|---|
| Adam A. Schwartzbaum, Esq. | Jordan A. Shaw, Esq. |
| 14 NE 1st Ave, Suite 705 | Zachary D. Ludens, Esq. |
| Miami, FL 33132 | Gabriel E. Morales, Esq. |
| adam@schwartzbaum.com | 95 Third Street, Second Floor |
| Tel.: (305) 725-1245 | San Francisco, CA 94103 |
| | jshaw@shawlewenz.com |
| | Tel.: (954) 595-6075 |
| SONN LAW GROUP PA | MURPHY'S LAW: THE CRYPTO LAW FIRM |
| Jeffrey R. Sonn, Esq. | T. Liam Murphy, Esq. |
| 19495 Biscayne Blvd, Suite 607 | 353 Lexington Avenue, 4th Floor, Suite 400 |
| Aventura, FL 33180 | |

| jsonn@sonnlaw.com<br>Tel.: (305) 912-3000 | New York, New York 10016<br>liam@murphyslawcrypto.com<br>Tel.: (913) 575-0540 |
|---|---|

## PROOF OF SERVICE

I, the undersigned, certify that on March 27, 2026, I caused a true and correct copy of Petitioners' Motion for Transfer Pursuant to 28 U.S.C. § 1407, together with all supporting papers, to be served in compliance with Rule 4.1 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, as follows:

### I.     SERVICE ON COUNSEL OF RECORD IN RELATED ACTIONS

Pursuant to JPML Rule 4.1(a), service was made electronically via CM/ECF upon all counsel of record in the related actions:

*Counsel for Plaintiffs David Josef Roshwald, JP Politano, and Jacqueson Elie*

SILVER LAW GROUP
Scott L. Silver, Esq.
Ryan A. Schwamm, Esq.
Peter M. Spett, Esq.
1780 W. Sample Road
Coral Springs, FL 33065

GIBBS MURA LLP
David Stein, Esq.
Linda P. Lam, Esq.
1111 Broadway, Suite 2100
Oakland, CA 94607

*Counsel for Plaintiff Robby Steele*

SHAW LEWENZ
Jordan A. Shaw, Esq.
Gabriel E. Morales, Esq.
Zachary D. Ludens, Esq.
110 S.E. 6th Street, Suite 2900
Fort Lauderdale, FL 33301

21

SONN LAW GROUP, P.A.
Jeffrey R. Sonn, Esq.
Brian Pastor, Esq.
19495 Biscayne Blvd., Suite 607
Aventura, FL 33180

ADAM A. SCHWARTZBAUM, P.A.
Adam A. Schwartzbaum, Esq.
14 N.E. 1st Ave., Suite 705
Miami, FL 33132

MURPHY'S LAW: THE CRYPTO LAW FIRM
T. Liam Murphy, Esq.
353 Lexington Avenue, Suite 400
New York, NY 10016

*Counsel for Plaintiff Eric Logwood*

MCLETCHIE LAW
Margaret A. McLetchie, Esq.
Leo S. Wolpert, Esq.
602 South Tenth Street
Las Vegas, NV 89101

SHAW LEWENZ
Jordan A. Shaw, Esq.
Gabriel E. Morales, Esq.
110 S.E. 6th Street, Suite 2900
Fort Lauderdale, FL 33301

SONN LAW GROUP, P.A.
Jeffrey R. Sonn, Esq.
Brian Pastor, Esq.
19495 Biscayne Blvd., Suite 607
Aventura, FL 33180

ADAM A. SCHWARTZBAUM, P.A.
Adam A. Schwartzbaum, Esq.
14 N.E. 1st Ave., Suite 705
Miami, FL 33132

MURPHY'S LAW: THE CRYPTO LAW FIRM
T. Liam Murphy, Esq.
353 Lexington Avenue, Suite 400
New York, NY 10016

## II.     SERVICE ON DEFENDANTS

Because no defendants have appeared, service was made by first-class mail and email to:

JPMorgan Chase Bank, N.A.
Legal Papers Served
Mail Code LA2-7100
1414 Woodward Avenue
Ruston, LA 71270-2015
Stacey Friedman, General Counsel, JP Morgan Chase, at stacey.friedman@jpmchase.com

BANK OF AMERICA, N.A.
330 North Brand Blvd., Suite 700
 Glendale CA  91203
Lauren Mogensen, Global General Counsel for Bank of America, at lauren.mogensen@bofa.com

## III.    SERVICE UPON TRANSFEROR COURT

In accordance with J.P.M.L. Rule 4.1(b), I hereby certify that a notice of filing of the

transfer motion and a schedule of actions shall be transmitted to the clerk of each district court

where an affected action is pending for filing in the affected actions.

## IV.     CERTIFICATION

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 27, 2026

Respectfully submitted,

By: */s/ Adam A. Schwartzbaum*
Adam A. Schwartzbaum, Esq.

23